UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                Case No. 24-CR-88

JAMES MORGAN, a/k/a "KARACTUS
      BLOME,"

        Defendant.

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The United States of America, by and through its attorneys, Gregory J. Haanstad, United States Attorney, and John P. Scully, Assistant U.S. Attorney, hereby responds to defendant James Morgan's Motion to Dismiss (Dkt. 12).

The defendant's motion should be denied because it rests on a faulty premise: that the Supreme Court's decision in *Bond v. United States* changed the landscape of criminal liability applicable to the defendant. The decision did no such thing. Facing a "curious case" arising out of an "exceptional convergence of factors," the majority in *Bond* found that 18 U.S.C. § 229 did not reach the conduct of defendant Bond, who attempted to poison her husband's pregnant mistress through the use of a "chemical irritant." 572 U.S. 844, 848, 866 (2014) (stating "[t]his case is unusual, and our analysis is appropriately limited."). The Court in *Bond* did not strike down Section 229; it interpreted it. Prosecuting the defendant for possessing precursors to chlorine gas, a recognized chemical weapon, for a non-peaceful purpose, fits squarely within the statute's purview.

Section 229 is also constitutional. It provides adequate notice of the conduct it criminalizes, and is a valid exercise of congressional authority to implement the Chemical Weapons Convention and to regulate commerce. For these reasons, the defendant's Motion to Dismiss should be denied.

## **BACKGROUND**

The defendant is charged with possession of a chemical weapon, in violation of 18 U.S.C. § 229(a)(1), a statute passed to implement the United States' obligations under the Chemical Weapons Convention. Both the treaty and the statute are described below.

A.    Chemical Weapons Convention

The "horrors of chemical warfare" experienced during World War I "led to an overwhelming consensus in the international community that toxic chemicals should never again be used as weapons against human beings." *Bond v. United States*, 572 U.S. 844, 847–48 (2014). In 1997, the United States Senate gave its advice and consent to ratification of the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on Jan. 13, 2013, S. Treaty Doc. No. 21, at 278–451, 103d Cong., 1st Sess. (1993); *see* S. Res. No. 75,105th Cong., 1st Sess. (1997); 143 Cong. Rec. 6,426–27 (1997) (the "CWC"). The CWC was intended to fill the gaps left by an earlier chemical weapons convention, the 1925 Geneva Protocol, which prohibited use of chemical weapons only during warfare. S. Exec. Rep. No. 33, 104th Cong., 2d Sess. 2 (1996) (Senate Report). The international CWC has been ratified or acceded to by at least 190 countries. *Bond*, 572 U.S. at 847–48.

The CWC sought "to exclude completely the possibility of the use of chemical weapons," and provided that government actors "never under any circumstances" may "use chemical weapons" or "develop, produce, otherwise acquire, stockpile or retain chemical weapons, or

transfer, directly or indirectly, chemical weapons to anyone." CWC (preamble), 5a (art. I, para. 1). The CWC obligated each State Party to enact domestic penal legislation that prohibits "natural and legal persons anywhere on its territory . . . from undertaking any activity prohibited to a State Party" under the Convention. *Id*. (art. VII, para. 1(a)).

The CWC defines chemical weapons as, among other things, "[t]oxic chemicals and their precursors, except where intended for purposes not prohibited under this Convention, as long as the types and quantities are consistent with such purposes." CWC (art. II, para. 1(a)). The term "toxic chemical" means "[a]ny chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals" and "includes all such chemicals, regardless of their origin or of their method of production, and regardless of whether they are produced in facilities, in munitions or elsewhere." *Id*. (art. II, para. 2). The purposes not prohibited under the CWC include "[i]ndustrial, agricultural, research, medical, pharmaceutical or other peaceful purposes." *Id*. (art. II, para. 9).

### 2. Implementation Act of 1998

To implement the United States' obligations under the CWC, Congress enacted the Chemical Weapons Convention Implementation Act of 1998, Pub. L. No. 105-277, Div. I, 112 Stat. 2681–856 (the "Implementation Act"). The criminal provisions of this Act mirror in all material respects the prohibitions in the Convention. For example, 18 U.S.C. § 229(a)(1) makes it unlawful for a person knowingly "to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon." *Cf.* CWC (art. I, para. 1(a)).

The term "chemical weapon" is defined as "[a] toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is

consistent with such a purpose." 18 U.S.C. § 229F(1)(A). The Implementation Act, in turn, defines a "toxic chemical" to include "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." 18 U.S.C. § 229F(8)(A).

The Implementation Act also contains a set of exemptions to ensure that it reaches malicious conduct, exempting the use of chemicals for peaceful, protective, unrelated military, or law enforcement purposes. 18 U.S.C. § 229F(7). Following the CWC, the statute exempts "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity." 18 U.S.C. § 229F(7)(A). The defendant violated that Act when he knowingly possessed the precursor chemicals of chlorine gas—one of the chemical weapons that so horrified the world during World War I—without a peaceful, protective, law enforcement, or military purpose.

C.     Allegations Against Morgan

The defendant was charged in the Indictment with retaining, owning, and possessing, and attempting to retain, own, and possess, a chemical weapon—precursors (calcium hydrochlorite and hydrochloric acid) that, when combined, create chlorine and chlorine gas—not intended for peaceful, protective, law enforcement, or unrelated military purposes, in violation of 18 U.S.C. §§ 229(a) and 229F. Dkt. 1, at 1.

The government expects the evidence at trial will show that the precursor chemicals were found in the defendant's storage unit on December 21, 2023.[1] The defendant rented that unit beginning in July 2022, and paid rent on it through December 2023.

---

[1]     The defendant was also charged in the Western District of Wisconsin with possessing unregistered destructive devices, which were found in his trailer in Janesville, Wisconsin, on the same date. He pled guilty to that offense on April 16, 2024.

The calcium hypochlorite that the defendant possessed was 99% purity, and the label noted that it was "for laboratory, manufacturing, and educational use only":



Similarly, the hydrochloric acid was 37% purity, and was marked "DANGER May be corrosive to metals. Causes sever skin burns and eye damage. May cause respiratory irritation":



In 2022 and 2023, the defendant attended UW-Whitewater, where he studied chemistry. When agents interviewed him on December 21, 2023, he said he loved the physical sciences, wanted to obtain a PhD in chemistry, and had a gift for chemistry. He previously made statements about being a chemistry major in college and a weapon designer, who knew what he was doing and did not really need a conventional weapon.

On March 20, 2020, the defendant recorded a video displaying the chemical precursors, which he said were for making "a lot of chlorine very quickly." He also discussed the use of chlorine gas as a weapon. On January 23, 2022, Morgan texted: "Fuck, even with no MG42 [machine gun] right now, what I have is scary. And I don't mean just guns. I have two chemicals, totally legal, calcium hypochlorite and hydrochloric acid which when reacted together, produce a lot of chlorine gas very quickly. Just some classic WWI. Still can be effective if your enemy isn't ready for it."

On April 13, 2022, Morgan texted to an associate links showing where to purchase the precursors, and said: "1lb 99% Calcium Hypochlorite to 1 L 37% Hydrochloric acid is the ratio you want too so it works perfectly like that. 1 lb, 1 bottle. Lol crazy how that just works that way." On April 20, 2022, he texted the same links to another individual and stated: "These two items are exactly the right amount to react completely to make a lot of chlorine gas really fast. 1 lb calcium hypochlorite to 1L 37% hydrochloric acid." On July 8, 2022, Morgan visited multiple websites where one could purchase the chemicals.

On July 28, 2022, Morgan took a photo of the chemistry equipment setup in his apartment. A maintenance technician at Fox Meadows Apartment stated that, in the spring of 2023, he observed such chemistry equipment set up in Morgan's bedroom.

In May 2023, a co-worker stated the defendant said he learned how to make bombs at school. Another co-worker stated that they were concerned the defendant would be the "first person to go postal."

Morgan's also made statements demonstrating that he did not intend to use chlorine gas for a peaceful purpose. In the January 23, 2022, text discussed above, he mentioned that chlorine "can be effective if your enemy isn't ready for it" and referred to it as "Just some classic WWI." In that thread, Morgan mentioned using a generator indoors in the event of law enforcement entering his residence: "They kill your power and 20 guys charge in all at once and suddenly, it's like they're all just sleeping."

On May 10, 2023, Morgan again discussed what he would do if government agents entered his apartment. He sent messages to his girlfriend on Gab.com:

- [2023-05-10 20:42:30 UTC] <RealJM1993> Or if it's goobermint coming for the guns...I have a different plan entirely. We'll defeat them without firing a single shot.

- [2023-05-10 20:43:42 UTC] <Wisteria_Frost> Yeah, the 9mm or shotty, got it, hun. Of course, darling.

- [2023-05-10 20:45:48 UTC] <RealJM1993> If it's goobermint coming for the guns ...    -throws you a gas mask- Get it on NOW! -reacts calcium hypochlorite with hydrochloric acid, producing a huge amount of chlorine in the confined space of the apartment- ... now watch. Goobermint like a bunch of retards is gonna do their fave strategy where 20 guys charge in all at once.

- [2023-05-10 20:47:22 UTC] <Wisteria_Frost> Of course, I'll follow your plan if we have to deal with them, darling.

- [2023-05-10 20:49:00 UTC] <RealJM1993> Do you like that plan?

- [2023-05-10 20:51:01 UTC] <Wisteria_Frost> Yes, I love your plan. You're awesome when it comes to planning stuff.

- [2023-05-10 20:53:45 UTC] <RealJM1993> Then once they haven't heard from or seen their strike team for a good minute, they're gonna be really scared. Lol

The FBI Laboratory, Scientific Response and Analysis Unit, analyzed the effect of mixing the amounts of chemicals possessed—one pound of 99% calcium hypochlorite and one liter of 37% hydrochloric acid. The Lab estimated that combination would produce 145 liters of chlorine gas, which in an 800 square foot room, would generate a concentration of chlorine that could result in serious, long-lasting health effects, an impaired ability to escape, and even death. The report stated that the resulting chlorine would be a yellow/green noxious gas, visible and easily detected by smell. At those concentrations, serious pulmonary health effects would be likely to occur rapidly upon exposure.

## ARGUMENT

The defendant argues that the Court should dismiss the Indictment because: (1) his "charged conduct is outside the statute's scope," as he possessed "household cleaning agents"; (2) applying the statute to his "purely local activity violates the Tenth Amendment"; and (3) the statute as applied to his conduct is unconstitutionally vague.

## I.     Section 229 Plainly Reaches the Defendant's Conduct under *Bond*

The defendant argues that *Bond* bars the charge in this case because Section 229 does not reach "purely local" activity, Dkt. 12, at 5, based on *Bond*'s description of "the natural meaning" of  "chemical weapon," a term that takes into account (1) "the particular chemicals that the defendant used" and (2) "the circumstances in which she used them." 572 U.S. at 861. Both factors, however, support the application of Section 229 to the defendant's possession of chlorine precursors in the circumstances here.

The defendant's motion should be denied because this prosecution is a valid application of Section 229. As discussed below, this prosecution does not raise the concerns of the majority in

*Bond*. Section 229 plainly reaches the conduct alleged in Count One: possession of precursors to a recognized chemical weapon, chlorine gas, with the potential to harm numerous people.

### A.     Section 229 Applies to Chlorine Gas and Its Precursors

Defendant's argument that he did not possess a chemical weapon within the meaning of § 229 derives from his reading of *Bond*, in which the defendant was accused of placing chemical irritants on the doorknob, car door, and mailbox of her husband's mistress with the hope of inducing an uncomfortable rash. 572 U.S. at 852. The only harm suffered by the victim was a minor thumb burn, which she treated by rinsing her thumb with water. *Id*. at 848. The defendant argued that § 229 was unconstitutional as applied to her under the Tenth Amendment. *Id*. at 853.

The Supreme Court declined to answer the constitutional question but instead interpreted § 229, applying "basic principles of federalism" to determine that the statute does not reach "local criminal conduct," such as the "simple assault" perpetrated by Bond. *Id*. at 859–60, 864. Rather, § 229 applies to conduct that implicates the federal government's interest in "enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering." *Id*. at 864.

In reaching this conclusion, the Court construed the statutory term "chemical weapon" according to its "ordinary meaning," which "takes account of both the particular chemicals that the defendant used and the circumstances in which she used them." *Id*. at 861 (explaining that the chemicals used by Bond to induce a rash could not be considered chemical weapons, but that they "might be chemical weapons if used . . . to poison a city's water supply").

The Court also distinguished Bond's conduct from previous prosecutions under § 229, all of which predominantly involved "either terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people." *Id*. at 863–64 (citing, among

others, *United States v. Crocker*, 260 F. App'x 794 (6th Cir. 2008) (defendant attempted to acquire VX nerve gas and chlorine gas as part of a plot to attack a federal courthouse); *United States v. Krar*, 134 Fed. App'x 662 (5th Cir. 2005) (per curiam) (affirming sentence of defendant who possessed sodium cyanide); *United States v. Fries*, 2012 WL 689157 (D. Ariz. Feb. 28, 2012) (defendant set off a homemade chlorine bomb in the victim's driveway, requiring evacuation of a residential neighborhood)). As the Court put it, the federal government "undoubtedly has a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering," which "have not traditionally been left predominantly to the States." 572 U.S. at 864.

Post-*Bond*, several courts have construed the Supreme Court's two-factor analysis as defining the "chemical weapon" element of a criminal offense under § 229. *See, e.g., United States v. Le*, 902 F.3d 104, 114 (2d. Cir. 2018) (explaining that *Bond* defined the "chemical weapon" statutory element "by reference to two factors: (1) the type of chemicals in the case, and (2) the circumstances in which the defendant used them"); *United States v. Kimber*, 777 F.3d 553, 560–61 (2d Cir. 2015); *United States v. Levenderis*, 806 F.3d 390, 397 (6th Cir. 2015); *United States v. Chamberlain*, 2016 WL 624940, at *1 (N.D. Cal. Feb. 10, 2016). Thus, applying the *Bond* framework, "the question is whether the type and intended use of the [toxic chemical] in this case brings defendant's conduct within the common and ordinary meaning of ['chemical weapon']." *Levenderis*, 806 F.3d at 397 (applying *Bond* to a possession of a biological weapon charge under 18 U.S.C. § 175(a)); *see also Le*, 902 F.3d at 114–15 (interpreting *Bond*'s "two factor[]" definition of "chemical weapon" and explaining that where "the type of toxin at issue is particularly deadly, serves no other purpose than to kill, and poses a severe threat to public health and safety, the first

*Bond* factor may, by itself, carry sufficient weight to have [a chemical] fall within the natural meaning of a [chemical weapon]") (internal quotations and citations omitted).

Accordingly, the defendant's argument that the chemical precursors he allegedly possessed do not constitute a "chemical weapon" under § 229, but rather were simply "legal and readily obtainable common cleaning products," Dkt. 12, at 15, is a factual question that should be determined by the jury. *See United States v. Sandomire*, No. CR 20-00085 JMS, 2021 WL 217876, at *4–5 (D. Haw. Jan. 21, 2021) ("whether Defendant's conduct is covered by the statute is not a question of law to be decided by the court, but rather a question of fact to be left to the jury."); *Chamberlain*, 2016 WL 624940, at *1 (including this element in a jury instruction: "you may not convict the defendant of this charge unless you . . . find, beyond a reasonable doubt, considering both the particular toxin and the circumstances surrounding the defendant's possession of it, that there was a potential for severe harm to many people"). Answering these questions at this stage would require an impermissible pre-trial determination of the evidence. The defendant's argument is thus an inappropriate basis upon which to seek dismissal of the charge against him at this stage. *See United States v. Ryan*, 428 F. Supp. 3d 31, 36 (W.D. Wis. 2019) (quoting *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) (stating, in prosecution for attempted possession of radioactive material and nuclear material, "[c]hallenging an indictment is not a means of testing the strength or weakness of the government's case, or the sufficiency of the government's evidence. . .").

Moreover, even if the court were to consider the argument, it would fail. The Indictment in this case properly alleges that the defendant knowingly possessed the precursors of chlorine gas. The Act defines the term "chemical weapon" to include the precursors of toxic chemicals. 18 U.S.C. § 229F(1)(A). A "precursor" is "any chemical reactant which takes part at any stage in the

production by whatever method of a toxic chemical," including "any key component of a binary or multicomponent chemical system." 18 U.S.C. § 229F(6)(A). Chlorine gas is a lethal and recognized chemical weapon, the possession of which is within the heartland of cases arising under Section 229. *See United States v. Fries*, 781 F.3d 1137, 1149 (9th Cir. 2015) ("[C]hlorine gas is toxic and qualifies as a chemical that is immediately dangerous to life and health."); *Kimber*, 777 F.3d at 561 ("[C]hlorine is commercially available, yet, as [*Bond*] suggested, it may serve as a chemical weapon when used to make a chlorine bomb."). Indeed, chlorine was involved in two of the four cases that the majority in *Bond* cited as traditional federal prosecutions arising out of Section 229, which the Court indicated were entirely appropriate. *See id*. (citing *Crocker*, 260 Fed.Appx. 794, and *Fries*, 2012 WL 689157 (D.Ariz., Feb. 28, 2012)). And after *Bond*, courts found that the statute applies to chlorine gas, and particularly to its precursors, which the Act includes in the definition. *See Sandomire*, 2021 WL 217876, at *5 (district court denied motion to dismiss where "Defendant possessed precursors to chlorine and chlorine gas—chemicals capable of causing mass harm.").

The amount of chlorine gas the defendant was able to produce with the precursors he possessed had the capacity to generate 145 liters of chlorine gas, which the FBI determined could (when released in a confined space) result in serious, long-lasting health effects and even death. That conclusion is consistent with the defendant's stated plan to cause harm to up to 20 law enforcement officers upon entry to his apartment.

As a result, there is no question that chlorine is an "extremely dangerous substance with the potential to cause severe harm to many people." *Bond*, 572 U.S. at 863. Chlorine, then, is undoubtedly a substance with "the potential to cause mass suffering," such that there is a clear federal interest in prosecuting its possession under Section 229. *See id*. (stating that "[t]hose crimes

have not traditionally been left predominately to the States, and nothing we have said here will disrupt the Government's authority to prosecute such offenses.").

**B.     Section 229 Applies to these Circumstances**

This prosecution is also appropriate under the circumstances of the case. The Court in *Bond* was clear to state that even the chemicals involved there could have constituted chemical weapons, depending on the purpose for which they were intended to be used. 572 U.S. at 861. The facts support that the defendant intended such generalized harm, and this prosecution is similar to others under Section 229.

**1.     The defendant intended more than a "common law assault"**

The defendant here is not the defendant in *Bond*. The evidence supports that he intended to do far more than use a chemical to cause a romantic rival "discomfort," an "uncomfortable rash," or a "minor thumb burn" treatable by rinsing with water. *Id*. at 844, 848, 861. The defendant possessed the precursors to chlorine gas, a chemical capable of causing severe harm or even death to multiple people. He made statements about why he had those precursors, for making "a lot of chlorine very quickly." He said that what he had was "scary," and made references to the First World War in reference to using chlorine gas, and how an "enemy" would not be ready for it. The defendant's own references confirm that his intended purpose was for "combat," as contemplated by the Supreme Court. *See Bond*, 572 U.S. at 861.

So too with his discussion of how he would use chlorine gas—not as a household cleaner, but to harm multiple people. He described a "plan" to "defeat" the government entering his apartment, "without firing a single shot." He specifically discussed mixing the two precursors at issue here, "producing a huge amount of chlorine in the confined space of the apartment. . . ." He indicated that the government would be "scared" after "20 guys charge in all at once," and then

"they haven't heard from or seen their strike team for a good minute. . . ." All the language the defendant used is consistent with a description of a weapon, an "instrument of offensive or defense combat." *Bond*, 572 U.S. at 861.

Moreover, the defendant possessed not only this weapon but several others, such as the improvised explosive devices (with nails as shrapnel) for which he was charged in the Western District. Those devices support the inference that the defendant intended significant harm to a large number of people. Contrary to the defendant's assertions, the possession of weapons such as chlorine gas precursors is exactly the kind of "warlike" action that Section 229 sought to punish. This prosecution satisfies *Bond*'s requirement that § 229 implicate the federal government's interest in prohibiting "acts with the potential to cause mass suffering." 572 U.S. at 863–64.

### 2.    This case is similar to other Section 229 prosecutions

The defendant's conduct, as alleged, does not present an unusual federal prosecution of a "purely local crime[]." *Bond*, 572 U.S. at 860. The prosecution of the defendant here is consistent with numerous other prosecutions involving chlorine or other chemicals under Section 229. As noted above, *Bond* cited, with approval, numerous prosecutions under Section 229 that involved similar circumstances as present here. *See, e.g., United States v. Ghane*, 673 F.3d 771, 776 (8th Cir. 2012) (affirming conviction of individual who possessed potassium cyanide in his apartment that he intended to use to commit suicide and "had thoughts of harming others," although he did not know who they were and he did not go through with suicide attempt).

Courts interpreting *Bond* have also found that Section 229 properly applies to prosecutions involving circumstances similar to the ones present here. The Ninth Circuit held that a defendant who detonated a chlorine bomb in a residential neighborhood based on a dispute with a customer could properly be prosecuted under Section 229. *Fries*, 781 F.3d at 1149 (noting that crime was

not "purely local" because bomb produced a large gas cloud, injured several people, required evacuation of the neighborhood, and involved a gas that "is toxic and qualifies as a chemical that is immediately dangerous to life and health."). The Second Circuit reached a similar conclusion under Section 229. *See, e.g., Kimber*, 777 F.3d at 561 (upholding conviction of defendant who placed liquid mercury in a medical center and observing that it was "not dispositive" that defendant's actions "happened not to cause significant injury" because "he placed many people at risk of serious harm").[2] The defendant's contemplated use of chlorine gas against the government in his home is also consistent with the prior caselaw. *See Ghane*, 673 F.3d at 775–76 (upholding conviction of an individual who possessed potassium cyanide at his home for the purpose of committing suicide, along with the intention of harming other people); *Levenderis*, 806 F.3d at 398–99 (upholding conviction for possession of ricin, which defendant intended to use as part of plan to commit suicide and burn down his house, while placing ricin at entrances to prevent first responders from entering the building).

The defendant's emphasis on whether he used chlorine gas similarly the misses the mark. For example, the defendant claims that he committed no overt acts in furtherance of a plan to use chlorine gas. *See* Dkt. 12 at 22. Of course, there is no requirement that the government wait until a defendant uses the chemical weapon. As *Bond* recognized, Section 229 exists to prevent such a weapon from being used by punishing possession of such substances with a non-peaceful purpose. 572 U.S. at 863–64 (noting that Section 229 applies to "acts with the *potential* to cause mass suffering" and "substances with the *potential* to cause severe harm to many people") (emphases

---

[2] The Sixth Circuit and the Tenth Circuit have reached similar conclusions. *See Levenderis*, 806 F.3d at 399 (affirming prosecution of defendant who possessed ricin, which he would have used to commit suicide and then employ against an unknown number of first-responders); *United States v. Hale*, 762 F.3d 1214, 1224–26 (10th Cir. 2014) (affirming conviction for perpetrating hoax when defendant sent letter purporting to contain hantavirus, which causes "very severe disease," even though the hantavirus was delivered in relatively innocuous mouse droppings).

added)). It nowhere sets forth the counter-intuitive proposition that law-enforcement officials must wait until a defendant uses a chemical weapon before apprehending and prosecuting him. *See Sandomire*, 2021WL217876, at *5 (denying motion to dismiss indictment charging defendant with possessing "precursors to chlorine and chlorine gas—chemicals capable of causing mass harm"); *Ghane*, 673 F.3d at 775–76 (upholding conviction for possession of potassium cyanide); *Levenderis*, 806 F.3d at 394 (affirming conviction, under 18 U.S.C. 175(a), for possession of biological toxin for use as a weapon based on defendant's statements about various plots that he had not actually carried out).

The possession of such a weapon for non-peaceful purposes is enough to violate Section 229—circumstances that were present here. Both the Convention and the Act aim not only to punish actual or imminent chemical weapons attacks, but also to address the possession of dangerous toxic chemicals. *See Bond*, 572 U.S. at 855–56 ("the Convention's drafters intended for it to be a comprehensive ban on chemical weapons"); 143 Cong. Rec. S1583 (Feb. 25, 1997) (statement of Sen. Biden) (the Convention and implementing legislation "will mean that states will control strictly all toxic chemicals and their precursors, [and] [a]ny prohibited activity under the convention will be criminalized"). It is unlawful under the Act to possess a toxic chemical or its precursors without a non-prohibited purpose, even if there is no current plan for non-peaceful use. 18 U.S.C. § 229(a). The mere possession of dangerous chemicals without a legitimate purpose presents a threat that the Convention and the Act sought to eliminate, both because these toxic chemicals might later be used for attack and because, even absent an intentional attack, their possession absent a legitimate purpose poses a grave danger to human life. *See, e.g.*, *Ghane*, 673 F.3d at 775–76 (affirming conviction under the Act for possession of potassium cyanide for use in

a potential suicide); *see also* 143 Cong. Rec. S3571 (statement of Sen. Wellstone) ("These chemical weapons are dangerous—not only because of intentional use, but also accidental use.").

The defendant likens the chlorine gas precursors at issue in this case to the "detergent under the kitchen sink" and the "stain remover in the laundry room" referred to in *Bond*, 572 U.S. at 862. *Bond* correctly reasoned that "no one would ordinarily describe those substances as 'chemical weapons.'" *Id*. The key word in that sentence, however, is "ordinarily." Ordinary household goods can become chemical weapons when possessed with the intent to combine them into dangerous toxic chemicals capable of causing severe harm to many people, like chlorine gas. *See id.* at 864; *Kimber*, 777 F.3d at 561 ("[C]hlorine is commercially available, yet, as *Bond II* suggested, it may serve as a chemical weapon when used to make a chlorine bomb."). These precursors become chemical weapons when possessed together, with the intent to combine them into chlorine gas, or in order to be prepared to do so. Unlike poisoning goldfish with vinegar, making chlorine gas is a federal crime because making chlorine gas has the potential to cause severe harm to many people. *See Bond*, 572 U.S. at 862–63; *Fries*, 781 F.3d at 1149.

The Convention broadly pertains to "the proliferation and use of chemical weapons," *id*., and was drafted with the explicit goal of prohibiting private actors from possessing and using chemical weapons. *See* Chemical Weapons Convention, S. Treaty Doc. No. 103-21, 1974 U.N.T.S. 317, pmbl. In *Fries*, the Ninth Circuit found that prosecution of a defendant who released chlorine gas in a residential neighborhood fell comfortably within the Convention's scope because the defendant's "conduct constituted possession of extremely dangerous substances with the potential to cause severe harm to many people." *Fries*, 781 F.3d at 1149 (internal quotation and citation omitted).

Likewise, the § 229 charge against the defendant here fits comfortably within the scope of the Convention. *Sandomire*, 2021WL217876, at *6. The Indictment alleges that the defendant possessed precursors to chlorine gas—the same toxic chemical possessed by the defendants in *Sandomire* and *Fries*. He possessed calcium hydrochlorite in 99% purity, in a bottle expressly designating it "for laboratory, manufacturing, and educational use only"—not the household cleaning purposes he now claims. He also possessed hydrochloric acid in a bottle clearly marked "DANGER." And the defendant discussed using those precursors in combination to create chlorine gas and harming up to 20 law enforcement agents. That was the non-peaceful purpose he stated— not for use as a household cleaner or pool shock,[3] as he now claims.

The defendant's challenge to the Indictment fundamentally misconstrues *Bond*, and Section 229 properly extends to the possession of precursors to chlorine gas, which has the potential to cause severe harm to many people.

## II.     The Chemical Weapons Implementation Act Is Constitutional

The defendant, relying on Justice Scalia's concurrence in *Bond*, argues that § 229 is: (1) unconstitutional as applied to him because it exceeds Congress' authority under the Necessary and Proper Clause and the Treaty Power, *see* Dkt. 12, at 23; and (2) unconstitutionally vague, *see* Dkt. 12, at 33. These claims also fail.

### A.     Section 229 Does Not Violate the Tenth Amendment

The defendant argues that Section 229 is an invalid exercise of congressional authority under the Treaty Power or the Commerce Clause. Courts, though, have found Section 229 to be both a valid exercise of congressional authority to implement the Chemical Weapons Convention, and valid under the Commerce Clause.

---

[3]     The government has no reason to believe that the defendant had or maintained a pool.

### 1.    Section 229 is valid under the Treaty Power

The defendant's argument regarding the Treaty Power must fail. The U.S. Constitution, Article II, Section 2, Clause 2, grants the federal government the power to make treaties. Article I, Section 8 of the U.S. Constitution, or the "Necessary and Proper Clause," states the following: "The Congress shall have Power . . . To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." In *Missouri v. Holland*, 252 U.S. 416 (1920), the Supreme Court held that "there can be no dispute about the validity of [an implementing] statute under Article I, Section 8, as a necessary and proper means to execute" a "valid" treaty. *Id*. at 432.

This is particularly clear where the statute enacts the central feature of a treaty addressing a subject of obvious international concern: the use of chemical weapons. The Third and Ninth Circuits have ruled that Section 229 is a proper exercise of congressional authority under the Treaty Power. In a decision reached after the Supreme Court's decision in *Bond*, the Ninth Circuit in *Fries* adopted the constitutional analysis of the Third Circuit regarding Section 229. 781 F.3d at 1148 (stating that "[w]e agree and adopt the Third Circuit's reasoning to upholding the constitutionality of § 229."). As such, the Ninth Circuit stated that "it was 'bound to take at face value the Supreme Court's statement [in *Holland*] that if the treaty is valid there can be no dispute about the validity of the statute as a necessary and proper means to execute the powers of government[.]" *Id*. (quoting *Bond*, 681 F.3d 149, 162 (3d Cir. 2012)). The Ninth Circuit agreed that "because the [Chemical Weapons] Convention falls comfortably within the Treaty Power's traditional subject matter limitation, the Act is within the constitutional powers of the federal government under the Necessary and Proper Clause and the Treaty Power, unless it somehow goes beyond the

Convention. . . ." *Id.* As a result, the Ninth Circuit in *Fries* concluded that "because the Convention pertains to the proliferation and use of chemical weapons, which are matters plainly relating to war and peace, we think it is clear that the Convention falls within the Treaty Power's core." 781 F.3d at 1148 (quoting *Bond*, 681 F.3d at 166).

Furthermore, there can be little question that the Implementation Act fulfills the United States' obligation under the treaty. The Implementation Act tracks the treaty's language in all material respects, as explained above, and clearly bears a rational relationship to the treaty, *see United States v. Comstock*, 560 U.S. 126, 134 (2010) ("[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power."). For these reasons, the Implementation Act was a valid exercise of Congress's power under the Necessary and Proper Clause together with the Treaty Power. *See Holland*, 252 U.S. at 432.

### 2.  Section 229 is valid under the Commerce Power

The defendant also argues that Section 229 exceeds Congress' authority under the Commerce Clause.[4] This argument too fails because Section 229 is part of a larger interconnected statutory scheme to promote legitimate trade in toxic chemicals through deterring impermissible use.

Congress may use its Commerce Power to, among other things, "regulate activities that substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16–17 (2005). When Congress uses this power, it may "regulate purely local activities that are part of an economic

---

[4]      While the defendant states that "Congress didn't rely on its Commerce Clause authority," Dkt. 12 at 31, the Supreme Court "has expressly rejected the contention that congressional authority is limited by the way Congress frames its authority in the statute." *Ryan*, 428 F. Supp. 3d at 46; *see also National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 564, 569–70 (2012).

'class of activities' that have a substantial effect on interstate commerce." *Id*. at 17. The Chemical Weapon Convention's objectives were far broader, including the "promot[ion of] free trade in chemicals as well as international cooperation and exchange of scientific and technical information in the field of chemical activities for purposes not prohibited under this Convention in order to enhance the economic and technological development of all States Parties." CWC (preamble). The Convention states that "a necessary step towards the achievement" of that "common objective[]" is "the complete and effective prohibition of the development, production, acquisition, stockpiling, retention, transfer and use of chemical weapons." *Id*. at 5a (preamble). Accordingly, each State Party agreed to "adopt the necessary measures to ensure that toxic chemicals and their precursors are only developed, produced, otherwise acquired, retained, transferred, or used within its territory for purposes not prohibited under this Convention." *Id*. at 27a (art. VI, para. 2).

Congress' statute implementing the Convention in turn established a comprehensive regulatory scheme governing legitimate commerce in toxic chemicals while at the same time safeguarding against their diversion into illegal channels. In particular, the Act created inspection requirements for certain facilities dealing in those chemicals, 22 U.S.C. § 6721, *et seq*., while also creating the criminal prohibitions at issue in this case, 18 U.S.C. § 229, *et seq*. The Commerce Department has promulgated extensive regulations to implement the statute. 15 C.F.R. Pts. 710–21. In fact, the chemical industry "is one of the most widely and deeply regulated industrial sectors" in the United States. Senate Report 217.

The constitutionality of Section 229 as a component of a larger regulation of commercial commodities follows directly from the Supreme Court's decision in *Gonzales v. Raich*, which analogized to statutes indistinguishable from the Act. The analysis of the Controlled Substances Act's regulation of drugs applies equally to the regulation of toxic chemicals by the Chemical

Weapons Convention Implementation Act of 1998. There is a "lucrative, interstate market" in such chemicals, many of them toxic. 545 U.S. at 25–26. Such chemicals have "useful and legitimate" applications, *id*. at 24, and the statute is intended both to "foster [their] beneficial use" and "prevent their misuse," *id*. In fact, the Act's provisions address commerce by expressly permitting the use of toxic chemicals for "industrial, agricultural, research, medical, or pharmaceutical activity." 18 U.S.C. § 229F(7)(A). Given the parallels between the CSA and the statute at issue here, it is not surprising that the Court in *Raich* cited as examples of valid exercises of the Commerce Power a series of treaty-implementing criminal statutes such as Section 175, which implemented the Biological Weapons Act. 545 U.S. at 26 n.36.

Even for conduct entirely within the state of Wisconsin,[5] this court should have "no difficulty" concluding that there is a rational basis to believe that the failure to regulate such intrastate activity would leave a "gaping hole" in the Chemical Weapons Implementation. *Raich*, 545 U.S. at 18 (describing CSA). Courts have "consistently relied on the commerce power to uphold federal statutes that regulate the market of dangerous items that affect interstate commerce, such as weapons and drugs, even when the defendant's conduct didn't involve interstate activity." *Ryan*, 428 F. Supp. 3d at 46. The *de minimis* nature of a particular violation did not remove it from the ambit of Congress' authority. "Where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." *Perez v. United States*, 402 U.S. 146, 154 (1971) (citation omitted).

The defendant's possession of chlorine gas precursors was within the class of activities prevented by the Chemical Weapons Convention, and the regulation of this activity was well

---

[5] While the defendant's possession of the chemicals occurred within Wisconsin, he also visited websites (such as eBay and Amazon) where one could purchase the chemicals, and texted links to other individuals where they could purchase the chemicals.

within the powers granted by the Commerce Clause. *See Le*, 902 F.3d at 119 (statute prohibiting possession of biological toxin ricin was proper exercises of Congress' authority under the Commerce Clause); *Ryan*, 428 F. Supp. 3d at 46–48 (statute prohibitng attempted possession of radioactive material was "a valid exercise of the commerce power, both as a general matter and as applied to this case").

Given these valid bases for Congress' action, there is no Tenth Amendment issue. *See New York v. United States*, 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."); *see also United States v. Wilson*, 159 F.3d 280, 288 (7th Cir. 1998) ("since we have found that Congress acted within its Commerce Clause power when it enacted § 922(g)(8), there is no Tenth Amendment violation in this case"); *Ryan*, 428 F. Supp. 3d at 34–35 (rejecting Tenth Amendment challenge to two weapon-of-mass-destruction statutes because "both statutes are proper exercises of Congress' authority under the Commerce Clause.").

### B.    Section 229 Does Not Violate Due Process

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." A criminal statute violates this guarantee if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015) (citing *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)); *see also United States v. Williams*, 553 U.S. 285, 304 (2008). Put another way, to survive constitutional muster a criminal statute must "establish minimal guidelines to govern law enforcement" such that it does not "permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574–75 (1974)

(internal quotations and brackets omitted). When a court construes a statute, there is a "strong presumptive validity that attaches to an Act of Congress." *United States v. Nat'l Dairy Prod. Corp.*, 372 U.S. 29, 32 (1963).

Adopting the position of the *Bond* concurrence, the defendant argues that the Court's interpretation of "chemical weapon"—defined by both the type of chemicals at issue and their use or intended use—does not give a person of ordinary intelligence fair notice of the statute's scope. In particular, he argues that "no person of ordinary intelligence would have fair notice that he violated a law meant to curb the instruments of chemical warfare because he possessed (for years) cleaning agents. . . ." Dkt. 12, at 33.

"'The touchstone of the inquiry is the meaning of the statute in light of common understanding and practice.'" *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010) (footnote omitted). When the plain text of the statute sets forth clear boundaries, the vagueness challenge is without merit. *Id*. Here, Section 229(a)(1) outlaws the possession of a chemical weapon. A "toxic chemical" includes "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals." 18 U.S.C. § 229F(8)(A). The language of the statute is sufficiently clear to give the defendant notice of toxic chemicals, a category to which chlorine and chlorine gas are generally considered to belong.[6] *See Fries*, 781 F.3d at 1149 ("[C]hlorine gas is toxic and qualifies as a chemical that is immediately dangerous to life and health."); *Kimber*, 777 F.3d at 561 ("[C]hlorine is commercially available, yet, as [*Bond*] suggested, it may serve as a chemical weapon when used to make a chlorine bomb.") The Supreme Court, interpreting the statute, explained that it does not "sweep in

---

[6]    Indeed, the chemicals the defendant possessed were marked "DANGER" and "for laboratory, manufacturing, and educational use only," providing an indication that the ordinary person would be aware of their dangerousness.

everything from the detergent under the kitchen sink to the stain remover in the laundry room" because "no one would ordinarily describe those substances as 'chemical weapons.'" *Bond*, 572 U.S. at 862. Nor, the Court made clear, does the statute apply to "purely local crimes," such as "simple assault." *Id*. at 863–64. Rather, the statute applies to a specific range of conduct—that involving chemicals capable of assassination, terrorism, and the potential to cause severe harm to many people. *Id*. at 863. This qualitative standard is sufficiently clear and concrete to survive constitutional muster. *See Sandomire*, 2021WL217876, at *6 (citing *Johnson*, 576 U.S. at 603–04) ("As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'")). As applied here, the statute encompasses the defendant's possession of chlorine gas precursors for a non-peaceful purpose, such that he cannot claim lack of fair notice.

Moreover, Congress specifically excluded from the statute's sweep possession of such materials for a peaceful purpose, including industrial, agricultural, research, medical, or pharmaceutical purposes or other (similar) activity. 18 U.S.C. 229F(7)(A). As the Eighth Circuit has stated, the statute thereby "provides a narrowing context," and "the government and the public can discern purposes that are peaceful and those that are not." *Ghane*, 673 F.3d at 778; *cf. United States v. Smith*, No. 14-CR-239, 2015 WL 998183, at *4 (E.D. Wis. Mar. 6, 2015) ("a person of ordinary intelligence has a reasonable opportunity to know what conduct is prohibited by" statute prohibiting possession of the toxin ricin, which "provides explicit standards to prevent arbitrary and discriminatory enforcement by federal prosecutors."). The statute provides adequate notice and does not encourage arbitrary or discriminatory enforcement. *See Sandomire*, 2021WL217876, at *6.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's motion to dismiss.

Respectfully submitted at Milwaukee, Wisconsin, this 2nd day of August, 2024.

GREGORY J. HAANSTAD
United States Attorney

By:    */s/ John P. Scully*
JOHN P. SCULLY
Assistant U.S. Attorney
Eastern District of Wisconsin
517 East Wisconsin Ave., Room 530
Milwaukee, WI 53202
(414) 297-1700
john.scully2@usdoj.gov